**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
ALAN L. FRANK LAW ASSOCIATES, P.C.,

                     Plaintiff,                    **REPORT AND**
                                             **RECOMMENDATION**
          -against-                      CV 17-1338 (NGG) (ARL)

OOO RM INVEST, VARWOOD HOLDINGS, LTD.,
TCAHAI HAIRULLAEVICH KATCAEV, SASHA
SCHMDT and SERGEY PIROZHNIKOV,

                    Defendants.
----------------------------------------------------------X
OOO RM INVEST, VARWOOD HOLDINGS, LTD.
and TCAHAI HAIRULLAEVICH KATCAEV,

                 Counter-Plaintiffs,

          -against-

ALAN L. FRANK LAW ASSOCIATES, P.C.,
ALAN L. FRANK and EUGENE A. KHAVINSON,

                 Counter-Defendants.
----------------------------------------------------------X
**LINDSAY, Magistrate Judge:**

      This interpleader action, commenced by the plaintiff, Alan L. Frank Law Associates Inc.

(the "Frank Firm"), stems from a written settlement agreement entered into by the defendants,

OOO RM Invest ("RM"), Varwood Holdings, Ltd. ("Varwood"), and Tcahai Hairullaevich

Katcaev, a/k/a Tsakhay Katsaev ("Katcaev") (collectively, the "Settling Parties"), and several

nonparties in an action filed in the Southern District of Florida. The settlement agreement

provided for the payment of settlement funds totaling $2,900,000 but did not dictate the way in

which the funds were to be distributed among the parties or the amount of funds that would be

designated for attorneys' fees. In the summer of 2016, the counter-defendant, Alan L. Frank

("Frank"), managing attorney of the Frank Firm, deposited $2,312,319.68 into the Registry of the

Florida District and retained $587,680.32 in attorney's fees and costs. Although Frank argues that none of the parties raised an objection to his fees, after this action was filed, the Settling Parties argued that Frank (1) deposited the money into the Registry despite the fact that he had failed to identify who was duly authorized to speak for RM at the outset of the action; (2) deducted $120,000 plus 20% of the settlement proceeds pursuant to a fee agreement that was not signed by Varwood, Katcaev, or a duly authorized constituent of RM; (3) counseled his clients to enter into the underlying settlement agreement without first arriving at an agreement among the Settling Parties as to the division of the settlement funds; and (4) sought and insisted upon a unanimous instruction regarding the distribution of the settlement funds from all of RM's shareholders, namely, Katcaev, Sasha Schmdt ("Schmdt") and Sergey Pirozhnikov ("Pirozhnikov"), rather than relying on an agreement, which the Settling Parties claim dictates the division of those assets. The Settling Parties also contend that neither Schmdt nor Pirozhnikov (collectively, the "Majority Owners")[1] have any entitlement to the interpleader funds as they were not parties to the underlying Florida action. Now before the Court, on referral from District Judge Garaufis, is the Settling Parties' motion for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Specifically, the Settling Parties seek a judgment declaring that the interpleader fund should be divided in accordance with the "Division Agreement," a document that is discussed in detail below. For the reasons set forth in this report, the Court respectfully recommends that the motion be denied.

---

[1] RM, Varwood, and Katcaev refer to themselves collectively as the "Settling Parties" despite the fact that Schmdt and Pirozhnikov claim an interest to the settlement fund by virtue of their ownership interest in RM. Schmdt and Pirozhnikov refer to themselves collectively as the "Majority Owners" despite the fact the Schmdt is no longer a participant in RM. For ease of reference, the undersigned will refer to the parties by the collective names they used in their submissions.

## BACKGROUND

The following facts are drawn from the parties' Local Rule 56.1 Statements and are uncontested unless otherwise noted.[2]  In addition, because this case has a lengthy procedural history, the context of which is necessary to an understanding of this report, the Court has included several facts previously set forth in Magistrate Judge O'Sullivan's Report and Recommendation dated December 1, 2016, District Judge Altonaga's Decision and Order dated December 16, 2016, as well as its own Report and Recommendation dated October 22, 2018.

### I.     Factual Background

### A.     *The Parties*

The Frank Firm is a professional corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business at 135 Old York Road, Jenkintown, PA 19046.  Compl. ¶ 1.  Frank is the founder and managing attorney of the Frank Firm.  Am. Counterclaim ¶ 9.  Khavinson is the attorney who referred RM to Frank to handle the Florida litigation and remained on board as co-counsel and to provide translation services.  *Id.* ¶¶ 14-19.  RM is a limited liability company organized under the laws of the Russian Federation with a principal place of business in St. Petersburg, Russia.  Settling Parties' Rule 56.1 Stmt. ¶ 1. When this lawsuit was filed, RM had three "participants" (an equity position similar to membership in a U.S. company): Katcaev, Schmdt, and Pirozhnikov.  *Id.* ¶¶ 2-5.  Katcaev, a resident of the Russian Federation, is a 25% participant of RM.  *Id.* ¶ 2.  Katcaev is also the sole owner, Technical Director and Attorney-In-Fact of the defendant Varwood, a corporation organized under the laws of Belize with a principal place of business is in Switzerland.[3]  Katcaev

---

[2] The Frank Firm, Frank and Khavinson have not submitted Local Rule 56.1 Counter-Statements.  As discussed below, they have not taken a position regarding the Settling Parties' motion for partial summary judgment.

[3] The Majority Owners note that Varwood does not transact any business.  Majority Owners' Rule 56.1 Counter-Stmt. ¶ 29.

Dec. ¶ 7; Settling Parties' Rule 56.1 Stmt. ¶¶ 8-9.  Since early 2019, Katcaev has acted as the Director General of RM.  Settling Parties' Rule 56.1 Stmt. ¶ 2.

Schmdt is a U.S. citizen residing in Brooklyn, New York.  Compl. ¶ 5.  Prior to April 23, 2018, Schmdt was a 50% participant of RM.  Settling Parties' Rule 56.1 Stmt. ¶ 4.  The parties dispute whether Schmidt ceased to be a participant after that date.  *Id.;* Majority Owners' Rule 56.1 Counter-Stmt. ¶ 4.  The Settling Parties assert that Schmdt's 50% interest in RM is "now" owned by BBR Bank.  Settling Parties' Rule 56.1 Stmt. ¶ 5.  Schmdt contends that "during the time of all principal conduct relevant to this dispute, [he] held a 50% ownership interest in RM."  Majority Owners' Rule 56.1 Counter-Stmt. ¶ 28.

Pirozhnikov is also a resident of the Russian Federation.  Compl. ¶ 4.  Pirozhnikov is a 25% participant of RM.  Settling Parties' Rule 56.1 Stmt. ¶ 3.  Nonparty Dmitri Grudtsin ("Grudtsin") was RM's Director General from September 2012 to January 2019.  *Id*. ¶ 6.  Neither Schmdt nor Pirozhnikov have ever been RM's Director General or received a power of attorney from RM's Director General.  *Id*. ¶ 7.

**B.    *The Underlying Arbitration, Lawsuit and Settlement***

In or around 2013, Katcaev negotiated a deal with Net Element, Inc. ("Net Element") a Delaware corporation with its principal place of business in North Miami Beach, Florida, whereby RM agreed to transfer its principal assets to Net Element in exchange for a promise of 30% of Net Element's stock.  Schmdt Decl. ¶ 7.  However, before Net Element transferred the stock, Katcaev suggested a new deal to Net Element that involved providing the compensation directly to Varwood instead of RM.  *Id.* ¶ 8.  Ultimately, the deal fell apart and Schmdt, purporting to act on behalf of RM, retained Frank to file a lawsuit against Net Element.  ECF No. 249.  Schmdt signed a retainer letter prepared by Frank, which stated "[t]he legal services that

[Khavinson and Frank] will provide in connection with [RM] will be based upon a flat rate of $120,000, plus 20% of all monies and/or other consideration obtained for the benefit of [RM]." *Id.* The retainer letter was not signed by any representative of Varwood or by Katcaev. *Id.*

Nonetheless, in early 2014, the Frank Firm filed an arbitration claim on behalf of Varwood and Katcaev against Net Element with the American Arbitration Association in Miami, Florida (the "Arbitration"). Settling Parties' Rule 56.1 Stmt. ¶ 10. Following the commencement of the arbitration, Frank then filed a complaint in the United States District Court for the Southern District of Florida on behalf of the Settling Parties against Net Element International, Inc. ("NEI"), Net Element, Inc., Dmitry Kozko and Mike Zoi (collectively the "Settling Defendants") and Berkley Insurance Company (*OOO-RM Invest v. Net Element, Inc.*, et al., Case No. 14-cv-20903)(the "Underlying Lawsuit"). *Id.* ¶ 11. On February 10, 2015, the Florida District Court entered an order consolidating the arbitration into the Underlying Lawsuit. *Id.* ¶ 12. On February 17, 2015, Katcaev and Varwood, through the Frank Firm and Frank as their counsel, filed a counterclaim and intervenor complaint. *Id.* ¶ 13.

Eight months later, the parties in the Underlying Lawsuit executed a Stipulation of Mediation Settlement (the "Settlement Agreement") pursuant to which they agreed to settle the case for $2,900,000.00. *Id.* ¶¶ 14, 15; Katcaev Dec. Ex. 1. The parties to the Settlement Agreement were RM, Varwood, Katcaev, Net Element International, Inc., Net Element, Dmitry Kozko, Mike Zoi and Berkley Insurance Company. ECF No. 147 at 4. Notably, although they are not listed as parties, Schmdt and Pirozhnikov signed the Settlement Agreement as shareholders of RM. Katcaev Decl. Ex. 1. Katcaev also signed the Settlement Agreement individually. *Id.* It is not clear who signed on behalf of RM and Varwood. *Id.*

As previously noted, the Settlement Agreement did not indicate how the settlement funds

were to be divided.  Settling Parties' Rule 56.1 Stmt. ¶ 15.  However, Frank contends that the three principals of RM - Katcaev, Schmdt, and Pirozhnikov - had agreed to split the settlement equally.  ECF 249.  Schmdt concurs that the RM participants had agreed to split the settlement proceeds equally despite the fact that his interest in RM was greater than 33%.  Majority Owners' Rule 56.1 Counter-Stmt. ¶ 36.

In addition to the $2,900,000.00 payout, the Settlement Agreement provided for the transfer of 1,000,000 shares of Net Element stock to the Settling Parties as additional consideration for the settlement.  Settling Parties' Rule 56.1 Stmt. ¶ 16.  However, an issue arose before the parties signed the Settlement Agreement concerning the transfer of that stock.  Specifically, the stock could not be transferred to any of the Settling Parties because they were not U.S. persons or companies.  *Id.* ¶ 17.  As a work around, Frank suggested that the parties agree to transfer most of the stock to Schmdt, who is a U.S. citizen.  *Id.*  Following that legal advice, the Settling Parties agreed to transfer 800,000 shares of the Net Element stock to Schmdt.  They also permitted Khavinson and Frank to keep 100,000 shares each. 19.  *Id.* ¶ 18.

On October 13, 2015, the Florida court entered its Final Order of Dismissal with Prejudice.  *Id.* ¶ 19.  Pursuant to the terms of the Settlement Agreement, all cash proceeds were made payable to "Alan L. Frank Law Associates, P.C. FBO Plaintiffs."  Katcaev Dec. Ex. Also, as agreed, Schmdt, Khavinson and Frank received the combined 1,000,000 shares of Net Element stock.  *Id.* ¶ 20.  Notably, by the time the Underlying Action was resolved, RM had effectively ceased operations and had no material assets other than its claim to the settlement proceeds.  Majority Owners' Rule 56.1 Counter-Stmt. ¶ 34.

**C.    *Division of the Proceeds***           .

Shortly after the Final Order of Dismissal was entered, Frank e-mailed Khavinson the

following note:

> Greetings
>
> We now have the net insurance proceeds in our Florida Trust account.
>
> Please remind the principals that we need tax ID numbers from each of them in order to release the money to them.
>
> We will also need a writing signed by all of them indicating who should receive each share of the proceeds. . . . .
>
> Please translate this into Russian and then forward to our clients [ASAP].

ECF 249.  The word "principals" in the email refers to Katcaev, Schmdt, and Pirozhnikov.  *Id.* According to Katcaev, when he received of a copy of Frank's email, Katcaev attempted to reach a resolution with the parties as to the distribution of the funds notwithstanding his belief that neither Schmdt nor Pirozhnikov had legal authority to weigh-in on RM's behalf.  *Id.*  Katcaev also demanded that the settlement proceeds be sent directly to RM for distribution.  Mooney Decl. Ex. A; 31:14-32:15.  When Frank refused, Katcaev then demanded that Frank distribute $200,000 to Schmdt, $100,000 to Pirozhnikov and the remaining $2,100,000 to him, individually.  *Mooney Decl. Ex. C*; Majority Owners' Rule 56.1 Counter-Stmt. ¶ 37.  Schmdt and Pirozhnikov urged Frank not to allow Katcaev to handle the distribution.  Majority Owners' Rule 56.1 Counter-Stmt. ¶ 37.  Rather, they requested that Frank distribute the settlement funds equally between themselves and Schmdt or, alternatively, pursuant to their ownership interests in RM.  *Id.*

As the parties could not agree on how to disburse the settlement proceeds, Frank suggested that they resolve their disagreement through mediation with Khavinson acting as the mediator.  ECF 249.  To that end, on November 9, 2015, Khavinson e-mailed Frank a draft proposed Mediation [Retainer] Agreement, whereby Khavinson who was already serving as co-

counsel in the case, was to be paid an additional $20,000.00 for his services as mediator. *Id.*
The Mediation Agreement was never signed. *Id.* Nevertheless, Khavinson suggests that he
conducted the mediation without Katcaev. *Id.* The mediation failed and Khavinson
recommended that the parties engage in binding arbitration. *Id.* Frank, on the other hand, raised
the possibility of commencing an interpleader action.

On December 14, 2015, newly retained counsel for RM, Varwood, and Katcaev then
emailed Frank:

> (1) Please continue holding the settlement proceeds in your trust account until
> further instructed. Insofar as you are considering depositing those proceeds
> with the Court, please refrain from doing so. The federal court charges
> significant fees for holding funds in the Court registry.
>
> (2) RM, Varwood, and Mr. Katcaev are in the process of determining how the
> $2.3M in net proceeds should be divided. This firm will advise shortly
> regarding their determination.
>
> (3) This firm will provide documentation evidencing the authority of its
> corporate representative clients to act on behalf of the corporate parties (i.e.,
> RM and Varwood). Absent receipt by you of conflicting documentation (i.e.,
> documentation that Mr. Schmidt has authority over RM or Varwood), the
> documentation to be provided by this firm should be conclusive as to who has
> legal authority to direct the distribution of the settlement proceeds and should
> obviate the need for further judicial involvement.

*Id.* Despite the Settling Parties' suggestion that the issue could somehow be resolved
without Schmdt's and Pirozhnikov's input, Frank once again responded: "I am going to
need something signed by everyone, which must include the three individuals that
signed the Settlement Agreement." *Id.*

Two days later, Schmdt sent an e-mail to Frank attaching an excerpt regarding RM from
the Russian Unified State Register of Legal Entities (the "EGRUL"). *Id.* The excerpt confirmed
that Pirozhnikov, Schmdt and Katcaev were RM's participants, with 25, 50, and 25 percent
interests, respectively. *Id.* Upon receipt, the Settling Parties immediately responded that despite

his majority ownership interest, Schmdt was not an authorized agent of RM; rather, Katcaev had power of attorney to act on behalf of the entity. *Id.* Frank responded: "Understood. We will have to initiate the interpleader." *Id.*

Notwithstanding that response, on December 17, 2015, Frank took another stab at resolving this dispute. *Id.* He emailed counsel for the Settling Parties advising that since "there [appeared to be an] interest in entering into binding arbitration," he would "NOT [be] initiating an Interpleader." *Id.* However, on December 24, 2015, the Settling Parties then learned that Khavinson intended to bill them $20,000.00 for his "mediation services," money which was to be deducted from the settlement funds without Varwood's consent. *Id.* Katcaev also learned that the Frank Firm intended to pay itself a contingency fee of 20% of the settlement funds. *Id.* Accordingly, on January 18, 2016, Katcaev sent a letter to Frank: (1) terminating Frank and the Frank Firm as counsel for the Settling Parties; (2) instructing the Frank Firm to wire the settlement funds (net of the Frank Firm's claimed fee); and (3) providing the Frank Firm with authenticated copies of powers of attorney from RM and Varwood, suggesting that Katcaev had legal authority to act on behalf of both entities. *Id.*

Shortly thereafter, Grudtsin, allegedly acting on behalf of RM, and Katcaev, acting on behalf of himself and Varwood, entered into the Settlement Proceeds Division Agreement ("Division Agreement"), which purportedly dictates the manner in which the settlement funds are to be distributed. Settling Parties' Rule 56.1 Stmt. ¶ 21. The Division Agreement reads as follows:

> This Settlement Proceeds Division Agreement ("Agreement") is made . . .by and among [RM], [Varwood] and [Katcaev] (collectively, the "Settling Plaintiffs"). . ..
>
> WHEREAS, on October 1, 2015, the parties to the Lawsuit, including the Settling Plaintiffs, executed a confidential Stipulation of Mediation Settlement

(the "Settlement Agreement"), which provides in relevant part for the payment of $2,900,000.00 to Settling Plaintiff s former counsel, Alan L. Frank Law Associates, P.C. ("Frank"), for the benefit of the Settling Plaintiffs;

WHEREAS, the Settlement Agreement does not specify how the approximately $2,308,129.60 of net settlement proceeds (i.e., the amount remaining after deduction of Frank 's fees and unpaid costs) (the "Proceeds") is to be divided among the Settling Plaintiffs;

WHEREAS, Frank has refused to distribute any portion of the Proceeds to any of the Settling Plaintiffs, which refusal has required the Settling Plaintiffs to retain legal counsel to recover the Proceeds;

WHEREAS, in order to preempt and avoid any conflict that might later arise among the Settling Plaintiffs regarding the division of any Proceeds recovered for their benefit (the "Recovery"), the Settling Plaintiffs have agreed to enter into this Agreement, which establishes how the Recovery is to be divided among the Settling Plaintiffs; . . .

WHEREAS, the Settling Plaintiffs have been fully advised by their respective counsel as to the terms and effects of this Agreement;

WHEREAS, the Settling Plaintiffs, through their respective counsel, have engaged in extensive arm's length negotiations in reaching this Agreement, including the exchange of relevant information;

NOW THEREFORE, each of the Settling Plaintiffs, for and in consideration of the mutual covenants, promises, and agreements contained herein, the sufficiency of which is hereby acknowledged, and intending to be legally bound, hereby agree as follows: . . ..

2.  Division of Recovery.  The Settling Plaintiffs agree to divide the Recovery as follows:

     a. The first $212,000 of the Recovery shall be paid to Varwood as reimbursement for the costs advanced by Varwood, on behalf of the Settling Plaintiffs, in the Lawsuit and related proceedings; and

     b. The remaining Recovery after the reimbursement of Varwood provided in subsection (a) shall be paid in even shares (i.e., divided 50%/50%) to RM and Varwood.

*See* Katcaev Decl. Ex. 2  The Division Agreement was signed by Grudtsin on behalf of RM on

some unspecified date, by Fernando A. Giz as Director of Varwood on January 29, 2016, and by

10

Katcaev on behalf of himself on January 26, 2016. *Id.*

Not surprisingly, the Majority Owners immediately disputed the validity of the Division Agreement. They asserted that the Division Agreement was not approved by all of the participants of RM and was, therefore, invalid. Majority Owners' Rule 56.1 Counter-Stmt. ¶ 21. They also emphasized that Katcaev had drafted the Division Agreement knowing that Varwood's claims against Net Element in the Underlying Action had been deemed worthless. Majority Owner's Mem. at 4. Schmdt and Pirozhnikov insisted that the settlement funds had only been paid as consideration for dismissal of the RM's claims. *Id.* Yet, pursuant to the Division Agreement, Katcaev stood to retain approximately 65% of the settlement proceeds despite his 25% interest in RM.

### D.   Actions Taken by the Settling Parties to Control RM following the Settlement of the Underlying Action

According to the Majority Owners, six weeks after this interpleader action was commenced, Katcaev fabricated the minutes of a general meeting of the RM Board that allegedly took place on April 8, 2016. *Id*. ¶ 43. The minutes reflect that the Board voted to have Grudtsin remain as Director General. *Id*. ¶ 43. Several weeks earlier, Katcaev had been alerted to the fact that Schmdt and Pirozhnikov were claiming that Grudtsin's appointment as Director General was invalid. ECF. 37. Schmdt and Pirozhnikov claim that the April 8 meeting never occurred. Schmdt Decl. ¶ 13; Pirozhnikov Decl. ¶ 2. In fact, they aver that they weren't in Russia despite the fact that their names appear on the minutes. Majority Owners' Rule 56.1 Counter-Stmt. ¶ 45. They insist that Katcaev forged their signatures. Schmdt Decl. ¶ 14; Pirozhnikov Decl. ¶ 3.

A few weeks later, Schmdt and Pirozhnikov took their own steps to appoint a new Director General for RM. Specifically, on April 28, 2016, the Majority Owners allegedly called "An Extraordinary General Meeting of the Members (owners) of RM Invest," in Petrozavodsk,

Karelia, Russia. *Id.* ¶ 40. Schmdt and Pirozhnikov say that they were represented at the meeting by Valeriy Leonidovich Matveev ("Matveev"), pursuant to powers of attorney. *Id.* ¶ 41. There is no indication that Katcaev was present. Indeed, it appears from the record that the only person present at the April 28 meeting was Matveev. Nonetheless, Schmdt and Pirozhnikov contend that their 75% interest constituted a quorum and they voted to remove Grudtsin as Director General and replace him with Konstantin Prudnichenko. *Id.* ¶ 42.

Sometime thereafter, Katcaev presented a court in Russia with a copy of the April 8 Minutes at a hearing to obtain an injunction leaving Grudtsin as Director General pending a future decision on the merits. *Id.* ¶ 47. Schmdt and Pirozhnikov did not receive notice of the hearing. *Id.* According to them, the Moscow court then appointed several independent experts to investigate the validity of the April 8 minutes and concluded that the signatures were indeed forgeries.[4] *See* Mooney Decl. ¶ 8, Ex. E. However, the Moscow court also ruled that notwithstanding the forgery, Grudtsin would remain Director General because the Majority Owners' April 28 meeting appointing Prudnichenko had been held in an incorrect location. Majority Owners' Rule 56.1 Counter-Stmt. ¶ 50.

Schmdt and Pirozhnikov appealed the decision regarding the incorrect location of the April 28 meeting, but the lower court decision was affirmed. *Id.* ¶ 51. Katcaev, thereafter, withdrew his own appeal concerning the forgery ruling. *Id.* Instead, Katcaev initiated an arbitration against RM in which he claimed that RM owed him approximately $4 million based on an alleged 2010 deal in which RM had agreed to pay him for the use of certain systems that he created. *Id.* ¶ 52. Schmdt avers that he was unaware of any such agreement. Schmdt Decl. ¶ 16. In addition, Schmdt claims he never received notice of the arbitration. Majority Owners'

---

[4] The Majority Owners have stated that the meeting occurred both on April 2 and April 8. The Court assumes one of the dates is a typographical error.

Rule 56.1 Counter-Stmt. ¶ 54.  Nonetheless, Katcaev initially received a favorable arbitration award but, according to the Majority Owners, two separate Russian courts have refused Grudtsin's requests to confirm award which was obtained without notice or defense.  *Id.* ¶ 55.

Finally, Schmdt also complains that subsequent to the Underlying Action, Katcaev defaulted on a loan that Schmdt had guaranteed before the breakdown in the parties' relationship.  *Id.* ¶ 56.  Schmdt alleges, in this regard, that Katcaev had an agreement with a "friendly banker friend" that the bank would only pursue Schmdt as the guarantor despite the fact that Katcaev was using the money.  *Id.* ¶ 57.  Schmdt contends that it was the loan default that lead to his being divested of an ownership interest in RM.  *Id.*  Schmdt claims that he is continuing to "fight this fraud" in the courts in Russia and is seeking to have Katcaev criminally prosecuted.  *Id.* ¶ 58.  It is for this reason that Schmdt will not concede that he no longer owns an interest in RM.

### 2.    Procedural History

On February 22, 2016, the Frank Firm commenced this action.  ECF No. 1; Settling Parties' Rule 56.1 Stmt. ¶ 22.  On May 9, 2016, Schmdt and Pirozhnikov filed their Answer and Crossclaim.  ECF No. 24.  In their crossclaim, they did not assert a claim to the settlement funds in their individual capacities.  Settling Parties' Rule 56.1 Stmt. ¶ 23.  Rather, they alleged that "the settlement payments belong 100% to RM." *Id.*  On May 23, 2016, the Settling Parties filed a Motion to Transfer the Case to the Southern District of Florida, a motion to which all parties, including Frank, consented.  ECF No. 41.  That motion was granted and the action was transferred to Florida on June 24, 2016.  On July 1, 2016, the Frank Firm then deposited $2,312,319.60 into the Registry of the Florida Court.  Settling Parties' Rule 56.1 Stmt. ¶ 24.  The Frank Firm retained $587,680.32 in addition to the Net Element shares for its attorney's fees and costs from the settlement funds.  ECF No. 249.  In response, the Settling Parties moved to

dismiss the interpleader complaint.  They also moved to dismiss the cross claims of Schmdt and Pirozhnikov.  ECF Nos. 72, 106.

In September, after several motions had been fully briefed, Magistrate Judge O'Sullivan ordered the parties to participate in mediation.  ECF No. 121.  The parties did so, but the mediation failed.  ECF No. 130.  The Frank Firm then filed a Motion for Discharge and Award of Attorneys' Fees and Costs incurred for bringing the interpleader action.  ECF No. 131.  On December 1, 2016, Magistrate Judge O'Sullivan issued a Report and Recommendation recommending that the Settling Parties' Motion to Dismiss the Complaint be denied, but that their Motion to Dismiss the [Majority Owners'] Crossclaim be granted due to their lack of standing.  ECF No. 147.  The next day, Magistrate Judge O'Sullivan issued a second Report and Recommendation recommending that the Frank Firm's Motion for Discharge and Award of Attorneys' Fees and Costs be denied.

In that Report, Judge O'Sullivan noted:

> Under the circumstances of this case, the Court should deny the plaintiff's request for discharge from liability and dismissal from this action.  "Although a successful interpleader action typically results in the court discharging the stakeholder . . . discharge is improper where the stakeholder is itself alleged to be independently liable to the defendants." This is not the typical interpleader case involving an innocent, disinterested stakeholder.  The plaintiff represented some of the defendants in the underlying litigation which resulted in competing claims to the settlement proceeds.  The Settling Parties have asserted that the instant interpleader action may have been avoided had the Settlement Agreement provided for the allocation of the Settlement Proceeds.

> Moreover, the Settling Parties vigorously object to the plaintiff's discharge and state that they will assert a counterclaim against the plaintiff if the Settling Parties' motion to dismiss is denied.  Thus, it is possible that the plaintiff may be liable to at least some of the defendants (the Settling Parties). This is not an instance where an innocent stakeholder unwittingly comes into possession of disputed funds.  As counsel of record for some of the parties in the underlying action, the plaintiff necessarily negotiated the terms of the Settlement Agreement.  For these reasons, the Court should not discharge the plaintiff from liability or dismiss the plaintiff with prejudice from this interpleader

14

action.

ECF No. 148 (internal citations omitted).

On December 16, 2016, District Judge Altonaga having received no objection from the Frank Firm, entered an Order adopting the Report and Recommendation and denying the Frank Firm's Motion for Discharge and Award of Attorneys' Fees. ECF No. 154. Three days later, the Court also adopted the Report and Recommendation dismissing the [Majority owners'] crossclaim. As a result, the Settling Parties then filed their answer, affirmative defenses, amended counterclaim, and crossclaim in which they asserted their claim to the funds. They also filed a third-party complaint against the Frank Firm, Frank, and Khavinson alleging legal malpractice, breach of fiduciary duty and a declaratory judgment as well as a crossclaim against Schmdt, which was later dismissed as untimely.[5] The Settling Parties were, however, permitted to amend their crossclaim to add claims against the Frank Firm, Frank, and Khavinson. ECF No. 167.

In the meantime, the Majority Owners continued to litigate the issue of the appointment of RM's General Director in Russia and allegedly lost. Settling Parties' Rule 56.1 Stmt. ¶ 27. On February 28, 2017, the Florida District Court then entered an Order transferring this case back to the Eastern District of New York. ECF No. 193. On May 22, 2017, the Frank Firm filed a renewed motion for discharge and attorneys' fees. ECF No. 214. That motion was denied. ECF No. 253. In January 2019, District Judge Garaufis lifted the stay on discovery and granted the parties leave to file motions, including the motion for partial summary judgment now before the Court.

---

[5] On March 23, 2017, the Frank Firm and Alan Frank served the Settling Parties with a Rule 11 Motion related to the allegations asserted in the counterclaims and third-party complaint.

### 3.    The Parties' Contentions

The Settling Parties contend that the settlement funds must be distributed pursuant to the terms of the Division Agreement.  They argue, in this regard, that there is no genuine dispute as to the person who had authority to act for RM when the Division Agreement was entered.  They note that Katcaev is the current Director General and that he prevailed in the Russian courts when Schmdt and Pirozhnikov challenged Grudtsin's authority to act on behalf of RM.  The Setting Parties further claim that the Florida District Court has already dismissed Schmdt's and Pirozhnikov's individual cross-claims with respect to the interpleaded funds on the grounds that they lack standing.  Finally, the Settling Parties contend that Schmdt does not have any interest in RM, and therefore, any claim that he may have had to the settlement funds is now moot.

The Majority Owners contend that the Division Agreement, in which RM purported to give up 50% of the settlement proceed to Katcaev's alter ego, Varwood, is self-serving and unenforceable under Russian law since it was not approved by all of the owners of RM.  They urge the Court to reject Katcaev's request to control the distribution of the settlement proceeds given his minority interest in RM and his history of attempting to take corporate assets for his personal use.

### DISCUSSION

### A.    Standards of Law

"'Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law.'"  *Puglisi v. Town of Hempstead*, No. 10 CV 1928, 2012 WL 4172010, *6 (E.D.N.Y. Sept. 17, 2012) (quoting *In re Blackwood Assocs., L.L.P.,* 153 F.3d 61, 67 (2d Cir. 1998) and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c)).  In deciding a summary

16

judgment motion, the district court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the opposing party. *See Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d 132, 137 (2d Cir. 1998). If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable. *See Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 129 (2d Cir. 1996), *cert denied*, 520 U.S. 1228 (1997).

The trial court's responsibility is "limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1224 (2d Cir. 1994). When, however, there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[T]here must exist 'specific facts showing that there is a genuine issue for trial' in order to deny summary judgment as to a particular claim." *Jamaica Ash & Rubbish v. Ferguson*, 85 F. Supp. 2d 174, 180 (E.D.N.Y. 2000) (quoting *Celotex,* 477 U.S. at 322). A moving party may obtain summary judgment by demonstrating that little or no evidence may be found in support of the non-moving party's case. Accordingly, "[w]hen no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Marks v. New York Univ.*, 61 F. Supp. 2d 81, 88 (S.D.N.Y. 1999).

### B.    The Settling Parties' Claim

As stated above, the Settling Parties claim that they are entitled to the entire settlement fund in accordance with the Division Agreement. They argue, in this regard, that the Division

Agreement provides a formula by which the settlement funds are to be divided. Settling Parties Mem. at 2-3. They further argue that the record is devoid of any evidence negating the validity of that agreement. In addition, the Settling Parties contend that neither Schmdt nor Pirozhnikov have any entitlement to the interpleaded funds. To this end, they claim (1) neither Schmdt nor Pirozhnikov were parties to the Underlying Action or Settling Parties for whose benefit the settlement funds were paid; (2) the Florida District Court already dismissed their claim to the funds on the grounds that they lack standing to assert RM's interests; and (3) Schmdt has not had any interest in RM since April 2018 so any claim to the funds that he might have had is now moot. *Id.* at 2.

As a threshold matter, the Court addresses the Settling Parties' claim that the Florida Court has already determined that Schmdt and Pirozhnikov lack standing to assert RM's interest in the settlement. In his December 1, 2016 Report and Recommendation, Judge O'Sullivan found that the Schmdt and Pirozhnikov had failed to adequately address the requirements for standing in their opposition memorandum. For that reason, he dismissed their crossclaim. However, Judge O'Sullivan did not conclude that Schmdt and Pirozhnikov were barred from asserting a claim to the settlement proceeds as participants of RM. Indeed, Judge O'Sullivan noted that:

> dismissal of the Crossclaim does not entitle the Settling Parties to the remaining Settlement Proceeds. The Participant Parties [(Schmdt and Pirozhnikov)] may still assert their challenges to the Division Agreement and to the distribution of the remaining Settlement Proceeds as defendants in this interpleader action. As noted above, "the respective rights of the claimants to the interpleaded funds," are determined at the second stage of an interpleader action.

18

ECF No. 147.  Accordingly, the Settling Parties' suggestion that the Florida decision somehow bars Schmdt and Pirozhnikov from asserting their rights to a portion of the settlement proceeds is simply incorrect.

Equally unavailing is the Settling Parties' claim that they are entitled to the entire settlement proceeds because Schmdt and Pirozhnikov were neither parties to the Underlying Agreement nor "Settling Plaintiffs" for whose benefit the settlement funds were paid.  Settling Parties' Mem. at 2.  It is undisputed that RM, Varwood and Katcaev – the Settling Parties - were the named "Settling Plaintiffs."  *Id.* at 4.  However, this argument blurs the real issue in this case. Schmdt and Pirozhnikov have not asserted individual claims to the proceeds because they were parties to the Underlying Action, they are claiming entitlement to a portion of the settlement fund by virtue of their participant interest in RM.  Indeed, to suggest that Schmdt and Pirozhnikov had "no interest" in the proceeds is simply disingenuous.  The record is replete with undisputed facts that suggest otherwise.  There is no question that, at the time of the settlement, Schmdt was a 50% participant of RM.  Settling Parties' Rule 56.1 Stmt. ¶ 4. Pirozhnikov was a 25% participant of RM.  *Id.* ¶ 3.  It is also telling that despite the fact that RM, Varwood, Katcaev were the only "plaintiffs" to the lawsuit, the parties in the Underlying Action required Schmdt and Pirozhnikov to sign the Settlement Agreement as shareholders of RM.  Katcaev Decl. Ex. 1.

Moreover, while the Frank Firm, Frank and Khavinson have not taken a position on this motion, their prior testimony is noteworthy.  Frank has always averred that the three principals of RM, namely, Katcaev, Schmdt, and Pirozhnikov agreed to split the settlement equally.  ECF 249. Indeed, shortly after the Final Order of Dismissal was entered, Frank e-mailed Khavinson looking for the tax ID numbers of all three of RM's participants so he could release the money to them.  ECF 249.  He also asked each of them to sign a statement indicating who would be

19

receiving shares of the proceeds.  *Id.*  In fact, nothing in the record suggests that anyone other than Katcaev believed that Schmdt and Pirozhnikov should be deprived of a share of the settlement funds.  Accordingly, the fact that they were not parties to the Underlying Action is irrelevant.

Moreover, the Settling Parties' contention that Schmdt's divesture of his RM shares somehow supports their claim that the Division Agreement should control the way in which the fund is divided lacks merit.  It is clear from the record that as of April 23, 2018, Schmdt was divested of his 50% interest in RM by BBR Bank.  Settling Parties' Rule 56.1 Stmt. ¶ 5.  Although Schmdt "disputes" that he ceased to be a participant on that date, *see* Majority Owners' Rule 56.1 Counter-Stmt*.* ¶ 4, the alleged dispute is based on the fact that Schmdt plans to continue fighting what he believes to be fraud.  Schmdt Dec. ¶ 10.  He does not, however, dispute that the bank currently owns his share of the company.  "Under Article III of the United States Constitution, 'the subject matter jurisdiction of the federal courts' is limited such that 'the 'parties must continue to have a personal stake in the outcome in the lawsuit' in order for the court's adjudication of the case to be proper." *Pisman v. Zucker*, No. 17 CV 7210 NGG SMG, 2019 WL 181313, at *3 (E.D.N.Y. Jan. 10, 2019)(*citing United States v. Wiltshir*e, 772 F.3d 976, 978 (2d Cir. 2014)).  "When an 'intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit, at any point during the litigation, the action can no longer proceed and must be dismissed as moot.'" *Id.* (citing *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 669 (2016)).  Accordingly, Schmdt can no longer claim entitlement to the interpleaded in this action.[6]

---

[6] The Court notes that no one has addressed whether BBR Bank is a necessary party to the interpleader action under Fed. R. Civ. P. 19(a)(2)(i) now that it owns Schmdt's share of RM.  Generally, a party is considered necessary if the "disposition of the action in [that party's] absence may as a practical matter impair or impede [its] ability to protect its interest in the subject matter of the action." *Bankers Tr. Co. v. Manufacturers Nat. Bank of Detroit*, 139 F.R.D.

However, the fact that Schmdt has been divested of his interest in RM is not determinative of the Settling Parties' right to have the interpleader fund distributed in accordance with the terms of the Division Agreement.  Nor does it determine the Settling Parties rights as against Pirozhnikov.  Indeed, the issue raised by the Settling Parties in this motion is the enforceability of the Division Agreement and, to that end, the Court finds that there is a genuine issue of fact.  The Settling Parties contend that Grudtsin signed the Division Agreement on behalf of RM when he was still RM's Director General and had authority to bind the L.L.C. Settling Parties Rule 56.1 Stmt. ¶ 6.  To that end, they offer an opinion from a lawyer in St. Petersburg that states that Grudtsin was not required to obtain prior approval from the L.L.C.'s participants in order to enter into the agreement.  ECF No. 18.  However, her opinion makes several assumptions.  She assumes that the Division Agreement was intended to perform "a previously achieved amicable settlement."  *Id.*  As such, she asserts that Grudtsin's approval of the Division Agreement was not "a large transaction" because "the agreement did not create new rights or impose new liabilities but only establishe[d] how each of the plaintiffs receives payments under the amicable agreement."  *Id.*

Notably, her opinion hints at the "competing" law offered by the Majority Owners regarding the approval of major transactions.  Specifically, in support of their argument that the Division Agreement is invalid, the Majority Owners refer to Article 46 of the Federal Law No. 14-Fz of February 8, 1998 on Limited Liability Companies ("Russian LLC Law"), which provides that "major transactions" must be approved "by the general meeting of the company's participants" in order to be valid:

> 1. A transaction . . . (in particular the transaction of loan, credit, pledge or guarantee) shall be deemed to be a major transaction, if it is associated with the acquisition or alienation or with possibility of the direct or indirect alienation

302, 310 (S.D.N.Y. 1991).

by the company of assets whose value comprises 25 and more percent of the value of the company's property, . . ..

3. A decision on the approval of a major transaction shall be taken by the general meeting of the company's participants.  The decision on approval of a major transaction shall cite the persons which are the parties to and beneficiaries under this transaction, the price and the subject thereof and other essential terms thereof. . . .

5. A major transaction completed with a breach of the requirements provided for by the Article may be recognized as invalid upon the claim of the company or a participant thereof.

See Mooney Decl. ¶ 2; Ex. A at §§ 46.1, 46.3, 46.5.

In this case, the parties are not disputing the applicability of Russian LLC Law.[7]  Rather, they dispute the application of that facts in this case to that law.  Whereas the opinion offered by the Settling Parties suggests that binding RM to the terms of the Division Agreement did not constitute a major transaction, Pirozhnikov argues otherwise.  He contends that by the time the Underlying Action was resolved, RM had no material assets other than its claim to the settlement proceeds.  Majority Owners' Rule 56.1 Counter-Stmt. ¶ 34.  Accordingly, he says that the Division Agreement, which purports to transfer of 50% of settlement proceeds, which everyone understood to be RM's asset, to Varwood was a major transaction that required approval at a general meeting of the participants.  It is undisputed that no such meeting took place. Majority Owners' Rule 56.1 Counter-Stmt. ¶ 21

Moreover, Pirozhnikov argues that the Division Agreement is "irrevocably tainted." He claims, in this regard, that despite the fact that Grudtsin was the Director General, the Division

---

[7] "Federal Rule of Civil Procedure 44.1 controls determinations of foreign law in federal court." *Rutgerswerke AG & Frendo S.p.A. v. Abex Corp.*, No. 93 CIV 2914 JFK, 2002 WL 1203836, at *16 (S.D.N.Y. June 4, 2002).  "Rule 44.1 gives a district court wide latitude in resolving issues of foreign law: 'The court in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.'" *Id.* (citing Fed. R. Civ. P. 44.1).  The Court's "[d]etermination of a foreign country's law is an issue of law." *In re Vitamin C Antitrust Litig.*, 810 F. Supp. 2d 522, 540 (E.D.N.Y. 2011).

Agreement is completely self-serving and was executed at Katcaev's direction in order to give him a bigger piece of the settlement pie. Indeed, the Division Agreement provided for the transfer of 50% of the settlement funds to Varwood, which Pirozhnikov claims is a shell corporation, despite the fact that both Grudtsin and Katcaev knew that the settlement funds were only paid as consideration for dismissal of the RM's claims. Majority Owner's Mem. at 4. As such, the Majority Owners claim that far from being an "amicable" "arm's length negotiation" as both the language of the Division Agreement and the opinion offered by the Settling Parties suggest, the terms of the Division Agreement were dictated by Katcaev for his own benefit. Majority Owners' Mem. at 4.

Indeed, it warrants mention that the terms of the Division Agreement are contrary to everyone's understanding of how the funds were to be split save for Katcaev. As previously noted, Frank has consistently asserted that Katcaev, Schmdt, and Pirozhnikov had agreed to split the settlement equally. ECF 249. Schmdt also contends that the RM participants had agreed to split the settlement proceeds equally. Majority Owners' Rule 56.1 Counter-Stmt. ¶ 36. Even Grudtsin appears to have conceded that he believed that the money was to go to RM. Mooney Decl. Ex. D, 35:4-36:1. Notably, at his deposition, Grudtsin confirmed that prior to signing the Division Agreement on RM's behalf, he had a "general idea" that Katcaev had already sent a direction to Frank to have the entire proceeds transferred to his private account. *Id.* However, he did not question that conduct because "Mr. Katcaev [was] the owner of RM, and for him there is no difference where the money [was being place], at RM or Mr. Katcaev." *Id.* Moreover, while he agreed that it was his job to ensure that RM "only paid money that it was obligated to pay," Grudtsin testified that when Katcaev advised him that the settlement was to be "split 50-50 between Varwood and RM," *see id.* 25:19-26:1, he took Katcaev's word that he was entitled to a

larger portion of the settlement proceeds.  *Id.* 32:11-33:18.  In contrast, nothing in his testimony suggests that considered Schmdt's then 50% participant interest or Pirozhnikov's 25% participant interest in RM when he signed the Division Agreement.

Finally, the Court places little weight in the Settling Parties' argument that the Division Agreement, nonetheless, controls how the funds are to be distributed because Pirozhnikov's time to invalidate that agreement has expired.  To begin with, the opinion offered by the Settling Parties contains to two timing provisions – a two month provision and a one year provision. ECF No. 18.  Neither party has adequately addressed which provision applies.  In addition, while the opinion suggests that the issue concerning the validity of the Division Agreement should have been raised in the Russian courts, the parties have litigated this issue in both Florida and New York from the onset of this case.  Accordingly, even assuming the time period to seek invalidation of the Division Agreement has expired under Russian Law, it is not at all clear to the Court if Pirozhnikov is entitled to equitable tolling under Russian law given the parties' attempt to litigate the issue here.  At a minimum, the Court would require expert testimony or additional briefing to make such a determination.  *See In re: Lyondell Chem. Co.*, 543 B.R. 428, 443–44 (Bankr. S.D.N.Y. 2016)("When determining the contours of foreign law, if a court recognizes its own ignorance of foreign law, it has the authority to direct the parties to brief the question." Indeed, "[w]here research provided by counsel is deemed inadequate, a court can demand a more "complete presentation by counsel" like "seeking the aid of expert witnesses in interpreting the law of a foreign state or of international law.").  Accordingly, drawing all reasonable inferences in the light most favorable to the opposing party, the undersigned respectfully recommends that the Settling Parties' motion be denied.

## OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  Such objections shall be filed with the Clerk of the Court via ECF.  Any requests for an extension of time for filing objections must be directed to Judge Garaufis prior to the expiration of the fourteen (14) day period for filing objections.  Failure to file objections within this period waives the right to appeal the District Court's Order.  *See* 28 U.S.C. § 636(b)(1); Fed R. Civ. P 72; *Mejia v. Roma Cleaning, Inc.*, No. 17-3446, 2018 U.S. App. LEXIS 28235, 2018 WL 4847199, at *1 (2d Cir. Oct. 5, 2018) ("Plaintiff has waived any objections to the Magistrate's finding" by failing to timely object); *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Beverly v. Walker*, 118 F.3d 900, 901 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

Dated: Central Islip, New York
        February 24, 2020

                          _____/s_____
                          ARLENE R. LINDSAY
                          United States Magistrate Judge