UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____
ALAN L. FRANK LAW ASSOCIATES, P.C.,

                Plaintiff,

      -against-

OOO RM INVEST, VARWOOD HOLDINGS,
LTD., TCAHAI HAIRULLAEVICH KATCAEV,
SASHA SCHMDT and SERGEY PIROZHNIKOV,

                Defendants.
_____
OOO RM INVEST, VARWOOD HOLDINGS,
LTD. and TCAHAI HAIRULLAEVICH KATCAEV,

                Counter-Plaintiffs,

      -against-

ALAN L. FRANK LAW ASSOCIATES, P.C.,
ALAN L. FRANK and EUGENE A. KHAVINSON,

                Counter-Defendants.
_____

**MEMORANDUM & ORDER**

**17-CV-1338 (NGG) (ARL)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff and Counter-Defendant Alan L. Frank Law Associates, P.C. ("Frank Firm") commenced this interpleader action on February 22, 2016 against Defendants and Counter-Plaintiffs OOO RM Invest ("RM"), Varwood Holdings, Ltd. ("Varwood"), and Tcahai Hairullaevich Katcaev (collectively, the "Settling Parties") and Defendants Sasha Schmdt and Sergey Pirozhnikov. (Compl. (Dkt. 1) ¶¶ 1-6.) The action arises from a $2.9 million settlement agreement between the Settling Parties and several nonparties. (Settling Parties' Rule 56.1 Stmt. ("Settling Parties' 56.1") (Dkt. 277-1) ¶ 15.) The Settling Parties subsequently asserted counterclaims against Frank Firm and its principal, Alan L. Frank (collectively, the "Frank Parties"), and Eugene A. Khavinson, alleging, *inter alia*, legal malpractice and breach of fiduciary duty.

(Settling Parties' Answer, Crossclaim, and Counterclaim ("Counterclaim") (Dkt. 169) at 9-19.)

In support of the damages element of their counterclaim, the Settling Parties retained Boris Yatsenko, a Moscow-based economist with Ernst & Young, as an expert. Pending before the court is the Frank Parties' Motion to Preclude the admission of Mr. Yatsenko's testimony. (*See* Mot. to Preclude (Dkt. 321); Mem. of Law in Opp. to Mot. to Preclude ("Mot. to Preclude Opp.") (Dkt. 323); Reply in Support of Mot. to Preclude ("Mot. to Preclude Reply") (Dkt. 320).) Also pending is the Frank Parties' Motion to Strike a declaration by Mr. Yatsenko that the Settling Parties addended to their opposition memorandum in response to the Frank Parties' Motion to Preclude. (*See* Mot. to Strike Decl. of Boris Yatsenko ("Mot. to Strike") (Dkt. 318); Mem. of Law in Opp. to Mot. to Strike ("Mot. to Strike Opp.") (Dkt. 333); Reply Mem. in Support of Mot. to Strike ("Mot. to Strike Reply") (Dkt. 334).)

For the reasons explained below, the Frank Parties' (Dkt. 321) Motion to Preclude is DENIED and their (Dkt. 318) Motion to Strike is DENIED.

## I.     BACKGROUND

The court assumes familiarity with the factual and procedural history of this case, and it provides a summary of that history only insofar as it is necessary to the resolution of the pending motions.[1] Except as otherwise indicated, the facts in this section are not in dispute.

---

[1] The facts are set forth in greater detail in Magistrate Judge Arlene Lindsay's Reports and Recommendations ("R&Rs"), and in the court's Memorandum and Order adopting those R&Rs. (*See* Feb. 24, 2020 R&R (Dkt. 302); Mar. 2, 2020 R&R (Dkt. 303); Mem. & Order Adopting R&Rs (Dkt. 335).)

## A. Factual Background

RM is a Russian limited liability company with its principal place of business in Russia. (Settling Parties' 56.1 ¶ 1.) At the time this lawsuit was filed, Defendants Katcaev, Schmdt, and Pirozhnikov were the three "participants" who held equity in RM. (*Id*. ¶¶ 2-5.) RM has effectively ceased operations, and its only material assets are its share of the settlement proceeds discussed below. (Schmdt & Pirozhnikov Rule 56.1 Stmt. ("Schmdt & Pirozhnikov 56.1") (Dkt. 280 at ECF pp. 13-19) ¶ 34.) In or around 2013, Katcaev negotiated a deal with Net Element, Inc. ("Net Element"), subject to which RM would transfer its principal assets to Net Element in exchange for 30% of Net Element's stock. (Decl. of Sasha Schmdt ("Schmdt Decl.") (Dkt. 280 at ECF pp. 2-6) ¶ 7.) The deal fell apart, and the Defendants retained Frank Firm to represent them in actions against Net Element, with Khavinson as co-counsel. (*Id*. ¶ 9; Settling Parties' 56.1 ¶ 17; Counterclaim ¶ 13.) Frank Firm filed a lawsuit against Net Element and other defendants in the Southern District of Florida, on behalf of RM, Varwood, and Katcaev. (Settling Parties' 56.1 ¶¶ 10-12.) The parties to this underlying lawsuit eventually reached a settlement agreement, subject to which the Settling Parties would receive $2.9 million and 1,000,000 shares of Net Element stock. (*Id*. ¶¶ 14-16.) After the deduction of attorney's fees and costs, the remaining value of the settlement fund was just over $2.3 million. (Settling Parties' 56.1 ¶ 24.)

The Settlement Agreement provided for the settlement funds to be released to Frank Firm and did not specify how those funds would be apportioned. (*Id*. ¶¶ 15, 20.) The Frank Parties, as well as Schmidt and Pirorzhnikov, suggest that Schmdt, Katcaev, and Pirozhnikov had agreed to split the proceeds from the settlement equally between the three of them, and Schmdt and Pirozhnikov asked Frank to distribute the funds accordingly. (Schmdt & Pirozhnikov 56.1 ¶ 36.) Katcaev opposed that plan and demanded,

through new counsel, that Frank transfer most of the proceeds to him. (*Id.* ¶ 37.) Frank subsequently brought this interpleader action to resolve the parties' dispute over the distribution of the settlement proceeds.

## B. Procedural Background

Frank Firm commenced this interpleader action in this court on February 22, 2016. (Compl. at 1.) The Settling Parties filed cross-claims in which they asserted their right to the settlement funds and brought counterclaims for legal malpractice, breach of fiduciary duty, and a declaratory judgment against the Frank Parties and Khavinson. (*See* Counterclaim.) On February 25, 2019, the court set September 16, 2019 as the deadline for discovery on the Settling Parties' counterclaims. (*See* Feb. 25, 2019 ECF Order.) The court later granted a short extension in order to accommodate the availability of the Settling Parties' damages expert, Boris Yatsenko of Ernst & Young's Moscow office. (*See* Aug. 21, 2019 ECF Order.) On June 17, 2019, the Settling Parties served their expert witness disclosures, which included a report by Yatsenko purporting to set forth an "independent estimation of losses" incurred by the RM as a result of the Frank Parties' failure to promptly direct the settlement funds to Katcaev. (*See* June 17, 2019 Report by Boris Yatsenko ("Yatsenko Report") (Dkt. 321-1 at ECF pp. 35-92) at ECF pp. 35, 37.) On September 24, 2019, the Frank Parties deposed Yatsenko. (*See* Tr. of Boris Yatsenko Deposition ("Yatsenko Tr.") (Dkt. 321-1 at ECF pp. 2-33).)

On February 24, 2020, the Frank Parties served a motion to preclude the admission of Yatsenko's opinions. The Settling Parties addended to their opposition motion a three-page declaration by Yatsenko, which sets forth some of the assumptions he made in reaching his loss estimate. (Decl. of Boris Yatsenko ("Yatsenko Decl.") (Dkt. 323-1).) On April 6, 2020, the Frank Parties served

a motion to strike Yatsenko's Declaration from the Settling Parties' Opposition Memo, arguing that it was an untimely supplemental expert report submitted after the close of discovery. (Mot. to Strike at 2.) The fully briefed motions to preclude and strike were filed with the court on April 6 and 7, 2020.

On November 30, 2020, the court adopted two R&Rs by Magistrate Judge Arlene Lindsay, denied the Settling Parties' motion for summary judgment, and partially granted and partially denied the Frank Parties' and Khavinson's motions to dismiss the Settling Parties' counterclaims. (*See* Mem. & Order Adopting R&Rs (Dkt. 335).)

## II.    LEGAL STANDARD

### A.  Motion to Preclude Expert Testimony

Federal Rule of Evidence 702, which governs the admissibility of expert testimony, permits "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" to testify if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

"The proponent of the expert testimony has the burden to establish these admissibility requirements, with the district court acting as a 'gatekeeper' to ensure that the 'expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)).

## B.  Motion to Strike Supplemental Declaration

Federal Rule of Civil Procedure 26(a)(2)(B) requires that expert testimony be accompanied by a written report that includes, *inter alia*, "a complete statement of all opinions the witness will express and the basis and reasons for them;" "the facts or data considered by the witness in forming them;" and "the witness's qualifications." "A party who has made a disclosure under Rule 26(a) . . . must supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect" or if the court so orders. Fed. R. Civ. P. 26(e). A party may not use information that it "fails to provide . . . as required by Rule 26(a) or (e) . . . unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

"In assessing whether exclusion is appropriate, courts must consider four factors: (1) the explanation for the delay in providing the evidence; (2) the importance of the new evidence; (3) the potential prejudice to the opposing party; and (4) whether a continuance is more appropriate." *Phoenix Light SF Ltd. v. Bank of New York Mellon*, No. 14-cv-10104 (VEC), 2019 WL 5957221, at *1 (S.D.N.Y. Nov. 13, 2019).

## III.    DISCUSSION

The Frank Parties contend that Yatsenko's testimony should be precluded because Yatsenko is not qualified to give an expert opinion, because his opinions are unreliable and based on assumptions provided by the Settling Parties, and because his opinions will not assist the trier of fact. They further argue that Yatsenko's supplemental declaration, which the Settling Parties addended to their memorandum opposing the Frank Parties' motion to preclude, is an impermissible effort to bolster Yatsenko's testimony. The question of whether to strike the supplemental

declaration, while chronologically subsequent to the issues raised in the *Daubert* motion, is logically prior, since the resolution of that question will determine whether the court may consider that declaration in evaluating the admissibility of Yatsenko's other testimony. Accordingly, the court considers the issue regarding the supplemental declaration first.

### A. Admissibility of Supplemental Expert Declaration

The Frank Parties ask the court to strike the eight-paragraph declaration by Yatsenko addended to the Settling Parties' opposition memorandum, on the theory that it constitutes an untimely effort to rebut the Frank Parties' *Daubert* motion. In the declaration, Yatsenko makes a handful of substantive assertions regarding the bases for his opinions. These include:

- that he calculated lost profits based on RM's profit and loss data from 2012, the year preceding the disputed transaction with Net Element, and also relied on RM's financial statements;

- that valuation and financial modeling experts routinely use data from financial statements in forming opinions;

- that his report rests on the assumption that if the Frank Firm had promptly disbursed the settlement funds to the Settling Parties, "RM would have been able to renew its contracts and resume operations" in January 2016, because he is "not aware of any signs or evidence" suggesting that a prompt resumption of operations would not have been possible if the settlement funds had been available;

- that the monthly revenue figures used in his loss estimate were comparable with RM's 2012 business activity and achievable within 1-2 years, given RM's 2011-2012 performance; and

- that the maximum monthly revenue of 2012, when adjusted for inflation for the years 2013-2015, exceeds the maximum monthly revenue projected for the years 2016-2019.

(Yatsenko Decl. ¶¶ 3-8.)

In determining whether supplemental evidence submitted after discovery deadlines should be excluded, courts follow a set of guiding principles. On one hand, courts "must exclude" "expert declarations filed in response to a *Daubert* motion" when they "expound[] a wholly new and complex approach designed to fill a significant and logical gap in the first report." *Phoenix Light*, 2019 WL 5957221, at *2. On the other hand, "courts may consider evidentiary details that a declaration provides in support of opinions already expressed in the expert's report" when such details "merely amplify and provide more support for" the previously expressed opinions. *Id.* When a *Daubert* motion invokes concerns about the reliability and application of the expert's methodology, declarations that are responsive to such concerns are generally seen as supplying a permissible form of support. *See id.*; *Advanced Analytics, Inc. v. Citigroup Global Mkts., Inc.*, 301 F.R.D. 31, 43 (S.D.N.Y. 2014). "The key issue is whether the expert declaration is sufficiently within the scope of the initial expert report, so that an opposing party is not sandbagged with new evidence." *Phoenix Light*, 2019 WL 5957221, at *2.

Yatsenko's supplemental declaration contains no new substantive evidence, analytical approaches, or opinions. Rather, it makes a handful of general assertions that are seemingly intended to clarify certain assumptions that inform Yatsenko's expert report, and which are challenged by the Frank Parties' *Daubert* motion. Insofar as the supplemental declaration supplies underlying rationales for those assumptions that were not expressly set forth in the expert report, it does so not by supplying new evidence, but rather through vague assertions that

Yatsenko's methods are typical of financial modeling or that no data existed to disprove his assumptions. Thus, the supplemental declaration merely amplifies and clarifies opinions raised in Yatsenko's expert report and is well within that report's scope. It is devoid of any new evidence that would "sandbag" the Frank Parties after the close of discovery.

For these reasons, the court finds that the supplemental declaration is not prejudicial to the Frank Parties, the evidence contained in the declaration is unimportant, and the arguments raised in the Frank Parties' *Daubert* motion suggest a clear explanation for why the Settling Parties seek to introduce this declaration after the close of discovery. The court therefore concludes that, to the extent the supplemental declaration constitutes evidence that the Settling Parties failed to timely provide as required by Rule 26(a), such a failure was effectively harmless. It therefore declines to exclude the declaration pursuant to Federal Rule of Procedure 37(c).

### B. Qualification of Yatsenko as Expert

Turning to the first issue raised in the Frank Parties' *Daubert* motion, the court considers whether Yatsenko is qualified to give expert testimony regarding RM's lost profits. Federal Rule of Evidence 702 requires that expert witnesses be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. That requirement "must be read in light of the liberalizing purpose of the Rule." *United States v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985). "Accordingly, even if a proposed expert lacks formal training in a given area, he may still have 'practical experience' or 'specialized knowledge' that qualifies him to give opinion testimony." *LVL XIII Brands v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 636 (S.D.N.Y. 2016) (citing *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995)).

"To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004). "[I]t is worth emphasizing that, because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields." *Nimely v. City of New York*, 414 F.3d 381, 399 n.13 (2d Cir. 2005). Nonetheless, "[a]n expert need not be precluded from testifying merely because he or she does not possess experience tailored to the precise product or process that is the subject matter of the dispute." *Hilaire v. DeWalt Indus. Tool Co.*, 54 F. Supp. 3d 223, 235-36 (E.D.N.Y. 2014). Indeed, "where . . . well-trained people with somewhat more general qualifications are available, it is error to exclude" their testimony simply because their qualifications are "insufficiently tailored to the facts of this case." *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 82 (2d Cir. 1997).

In *Stagl*, the Second Circuit found that the district court had erred in concluding that a mechanical engineer with experience in "human-machine interactions" was not qualified to give expert testimony regarding the design of an airport baggage claim because she lacked specific expertise regarding "airline terminal or baggage claim area design." *Id.* Reasoning along similar lines, district courts in this circuit have, for example, permitted a mathematician with no specific expertise in optics to testify regarding mirror design, where the party introducing the testimony sought to rely merely on his "general knowledge of mathematics." *Rosco v. Mirror Lite Co.*, 506 F. Supp. 2d 137, 145 (E.D.N.Y. 2007). They have also determined that an engineer was qualified to give expert testimony about the validity of an electrical consumption test, even though his training was not specifically in electrical engineering. *See Jensen v. Cablevision Sys. Corp.*, 372 F. Supp. 3d 95, 113-14 (E.D.N.Y. 2019).

On the other hand, "district courts in this circuit have" sometimes "found experts unqualified when they did not have direct experience with the particular product or field pertinent to the litigation." *Id*. at 113; *see, e.g.*, *Delehanty v. KLI, Inc.*, 663 F. Supp. 2d 127, 132 (E.D.N.Y. 2009) (precluding testimony by "self-proclaimed engineering consultant" on the subject of ladder design, where putative expert had no experience "specific to ladder design or accidents").

Here, the Settling Parties seek to offer Yatsenko's opinion as expert testimony on the subject of business valuation and lost profit projections for RM, a telecommunications company. Yatsenko's educational training was in physics and economics, and he holds doctorate degrees in both of those disciplines. (Yatsenko Tr. at 12:7-12, 13:10-14:2.) In connection with his position at Ernst & Young, he has also received specialized training in economic appraisal. (*Id*. at 12:16-13:9.) Prior to joining Ernst & Young, Yatsenko worked as an auditor in the oil industry. (*See id.* at 14:10-18, 15:12-17; Yatsenko Curriculum Vitae (Dkt. 321-1 at ECF p. 71).) At Ernst & Young, Yatsenko's responsibilities have included business appraisals and financial modeling in a variety of industries. (Yatsenko Tr. at 16:3-17:13.) In his current role as Partner, he works with a team that appraises businesses in a variety of industries, including oil, mining, telecommunications, and retail. (*Id*. at 17:14-18:2.) He estimates that his team works on between 50 and 120 appraisal projects each year, "at least four or five" of which relate to the telecommunications industry. (*Id*. at 18:3-22.)

While the industry with which Yatsenko is most familiar may be the oil industry, Yatsenko's expertise in financial appraisal appears to extend to a variety of industries, including the telecommunications industry. Yatsenko's general expertise in business valuation, coupled with what appears to be at least a passing familiarity with businesses in RM's industry, qualifies him

to provide expert testimony on RM's valuation and lost profits. Given Yatsenko's general qualification to perform appraisals of businesses, the court will not exclude his testimony merely because his experience is not more closely "tailored to the precise" type of business "that is the subject matter of the dispute." *See Hilaire*, 54 F. Supp. 3d at 236.

The Frank Parties also suggest that Yatsenko is unqualified because he has never previously testified in connection with United States-based litigation. (Mot. to Preclude at 8; Yatsenko Tr. at 21:20-23:7.) This argument takes a factor – a purported expert's prior experience testifying on related matters in similar litigations – that may, when present, support a finding that the expert is qualified, and attempts to construe the absence of that factor as probative of the purported expert's lack of qualification. The Frank Parties cite no case law that supports the proposition that a purported expert's lack of prior testimonial experience in U.S. courts suggests he or she is unqualified. Indeed, the Second Circuit referred to a similar argument, that a New York state court should exclude an expert's testimony because he had not previously testified in New York, as "flimsy" and "illogical," and noted that it would "preclude any new expert from testifying in New York," regardless of the expert's qualifications and the relevance of the proffered testimony. *Washington v. Schriver*, 240 F.3d 101, 111-12 (2d Cir. 2000).

Accordingly, the court finds that Yatsenko is qualified to give expert testimony concerning RM's valuation and lost profits.

### C. Reliability of Yatsenko's Opinion

The Frank Parties contend that the court should exclude Yatsenko's opinions as unreliable because they are based on speculation, conjecture, and assumptions provided to Yatsenko by the Settling Parties, and because they are rife with "analytical gaps." (*See* Mot. to Preclude at 8-16.) In particular, they argue that

Yatsenko's testimony is unreliable because he based his analysis only on RM's financial data from 2011-2012. (*Id*. at 8-10.) They also argue that Yatsenko's testimony rested on several unfounded assumptions supplied to him by the Settling Parties: that RM would have been able to resume operations in January 2016 if not for the Frank Parties' refusal to disburse the settlement funds; that all of the contracts RM lost due to the failed transaction with Net Element would have otherwise been viable into 2016; that RM would have experienced growth at a rate of 10% upon resuming operations; that RM had no assets and no debt as of December 31, 2015; and that RM would not have borne financial costs in fulfilling its obligations under a lost contract with a software application developer. (*Id*. at 10-16.)

Federal Rule of Evidence 702 requires that expert testimony be, *inter alia*, "based on sufficient facts or data" and "the product of reliable principles and methods" that the expert "reliably applied . . . to the facts of the case." Fed. R. Evid. 702 (b), (c), (d). "To decide whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Electra v. 59 Murray Enters., Inc.*, 987 F.3d 233, 254 (2d Cir. 2021).

"Although expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison, other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996). "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method" will not necessarily render an opinion inadmissible; rather, the court should admit the evidence unless "the flaw is large enough that

the expert lacks good grounds for his or her conclusions." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). This approach "accords with the liberal admissibility standards of the federal rules and recognizes that our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony." *Id*. The Second Circuit has drawn a distinction between expert analyses that "include[] less than all the relevant variables" and analyses that "omit[] the major variables," suggesting that while analyses in the former category are likely admissible, those in the latter category may not be. *Bickerstaff v. Vassar College*, 196 F.3d 435, 449 (2d Cir. 1999).

As explained below, and in light of the liberal approach to admissibility established by the Federal Rules of Evidence and precedential case law, the court finds that the purported analytical flaws identified by the Frank Parties do not rise to the level of establishing that Yatsenko lacked good grounds for his conclusions. Accordingly, while the flaws identified by the Frank Parties may ultimately counsel against ascribing substantial weight to Yatsenko's opinion, the court finds that the opinion is sufficiently reliable to be admitted into evidence.

### 1. Scope of Relevant RM Financial History

The Frank Parties' primary argument against the reliability of Yatsenko's testimony is that Yatsenko based his projection of RM's lost profits at the end of 2015 and expenses for the period spanning 2016-2019 solely on RM's financial records from 2011 and 2012, and not on its financial history from 2013-2015. (*See* Mot. to Preclude at 8-10.) In his deposition, Yatsenko testified that the Settling Parties provided him only with financial data from 2011-2012, and he explained that his analysis relied entirely on that information and that he "didn't do due diligence." (Yatsenko Tr. at 30:20-31:19.) On the basis of this testimony, the

Frank Parties argue that "Yatsenko was only provided with the financial data for the years[] deemed relevant by the Settling Parties," and suggest that he therefore failed to make an independent judgment about the relevance of the financial data from the missing years. (Mot. to Preclude at 9.)

In his deposition, Yatsenko made clear that while he only reviewed the financial records provided to him by the Settling Parties, he requested that information based on his own judgment that those records were the ones most relevant to his analysis:

> Q. Did you review the balance sheets for 2012, 2013, 2014, and 2015?
>
> A. If this information – well, if this information was necessary to do our analysis, then we would request this information. We didn't do due diligence of RM Invest for seven years. We only looked at the issues needed for the report. And then we requested the needed information and we used that information.

(Yatsenko Tr. at 32:22-33:5.) Yatsenko went on to explain that he viewed 2012 as a "model year" for RM, for financial modeling purposes, because it was the final "year when the company still conducted independent business before" entering a joint venture in 2013, and that the existence of the joint venture in 2013-2015 made it "incorrect to forecast [based on] the money flow in those years." (*Id.* at 34:5-21; 36:5-18.)

Yatsenko's testimony makes clear that he had a reasoned basis for considering RM's financial data from 2011-2012 only: he assumed that financial records from the years that coincided with

RM's joint venture were not relevant to a projection of RM's performance as an independent business. In other words, he regarded RM's most recent financial history as non-predictive and, effectively, irrelevant because it reflected RM's financial performance while it operated in a structurally different, non-independent manner. The court takes no view, at present, as to the wisdom or accuracy of that assumption. The Frank Parties are free to argue at trial that Yatsenko's assumption regarding the relevance of RM's 2013-2015 financial history was flawed, and that his opinions which rest on that assumption should be accorded little or no weight. But the assumption is not "so unrealistic and contradictory as to suggest bad faith," *Boucher*, 73 F.3d at 21, nor is it flawed in a manner so fundamental and glaring as to establish that Yatsenko "lacks good grounds for his . . . conclusions," *Amorgianos*, 303 F.3d at 267. Accordingly, the court declines to exclude Yatsenko's testimony as unreliable on this basis.

2.  Lost Contracts & Resumption of Operations

The Frank Parties argue that Yatsenko's testimony is also unreliable because his lost profit analysis is premised on the unfounded assumptions that, if not for the Frank Parties' alleged breaches, RM would have resumed full-scale operations in January 2016 and would have been able to retain or renew more than fifty contracts that it ultimately lost.

According to Yatsenko's testimony, the Settling Parties asked him to calculate the profits that RM lost, "arising from [its] inability to resume its full-scale operating activity" as of December 31, 2015, and provided him with a list of more than fifty "lost contracts" to take into consideration. (Yatsenko Tr. at 70:2-5; *see also* List of Lost Contracts (Dkt. 321-1 at ECF pp. 72-73).) Yatsenko did not review the contracts themselves, and he assumed that any contracts which expired prior to December 31, 2015 would

have been "easy to renew," if RM had sufficient "financial resources" from the prompt disbursement of the Net Element settlement funds. (Yatsenko Tr. at 70:5-71:17.) Yatsenko explained that he "worked on the assumption of the client that if he had enough financing, it would have been easier for him to renew those contracts" and noted that this was a "completely realistic situation" in Russia that he has observed from time to time. (*Id*. at 72:12-20.)

In his declaration that accompanies the Settling Parties' response to the Frank Parties' Motion to Preclude, Yatsenko reiterates that his report "assumes that, given the Frank Firm's timely disbursement of $2,300,00.00 to the Settling Parties, RM would have been able to renew its contracts and resume operations starting January 2016," and explains that he is "not aware of any signs or evidence why the business operations could not be resumed subject to availability of necessary financing and technical possibility." (Yatsenko Decl. ¶ 6.)

Yatsenko's deposition testimony and declaration indicate that he presumed that RM's lost contracts were easily renewable and that its business operations were immediately resumable, absent evidence to the contrary. His suggested justifications for these presumptions are admittedly vague and conclusory, but the presumptions are not necessarily unfounded. Moreover, contrary to Frank Parties' suggestion, Yatsenko asserts that these were his own assumptions, informed by his independent judgment and expertise. Accordingly, the court finds that the conclusory nature of these assumptions is, at most, a "minor flaw in [Yatsenko's] reasoning" that does not compel the exclusion of his opinion. *Amorgianos*, 303 F.3d at 267. The Frank Parties' arguments may be properly directed to the issue of weight.

### 3. Contract with OOO Arian

The Frank Parties also argue that Yatsenko failed to verify whether RM received an advance payment from OOO Arian ("Arian"), a company with which RM contracted for the development of a software application, and that he failed to consider the costs RM would have incurred in performing its obligations under that contract. (Mot. to Preclude at 15-16.)

The contract between RM and Arian, dated November 2015, called for an advance payment to RM of 19.92 million rubles, to be paid one month after the contract was signed. (Yatsenko Tr. at 107:17-108:13.) Yatsenko testified that he did not "have th[e] information" regarding whether or not Arian made its initial payment and that he was "never provided the confirmation of this advance payment." (*Id*. at 108:14-18.) He further testified that Arian's "final payment also was not provided" and that "the contract didn't go forward because RM Invest didn't receive" the $2.3 million from the Net Element settlement that it had expected. (*Id*. at 108:19-109:9.) The Settling Parties argue that the contract was never consummated because RM lacked the funds to fulfill its obligations, and they suggest that it is therefore "nonsensical" for the Frank Parties to expect Yatsenko to have verified whether Arian made its initial payment on a contract that was merely contemplated. (Mot. to Preclude Opp. at 12.) The Frank Parties respond that because both parties signed the contract in November 2015, a reliable expert would have inquired into whether an initial payment was made the following month in accordance with its terms. (Mot. to Preclude Reply at 7.)

The Frank Parties also contend that Yatsenko's analysis "failed to consider the roughly 40 million rubles it would cost to perform the contract" with Arian. (Mot. to Preclude at 15.) When asked at his deposition why his calculations omitted "any of the costs in order to perform this contract," Yatsenko replied that "the client

. . . expressed an opinion that if [RM] would have operated in the normal course of business, it would [have been] able to go forward with this contract and fulfill this contract . . . using its own manpower." (Yatsenko Tr. at 109:16-110:1.) The Settling Parties emphasize that, under the contract, $40 million rubles was the amount to be paid to RM by Arian, and not a cost to RM for which Yatsenko failed to account. (Mot. to Preclude Opp. at 12-13.) They also argue that the Frank Parties have failed to rebut Yatsenko's reasonable presumption that RM's costs of performing the contract, which consisted of software developers' salaries, were already covered by the regular operating expenses that Yatsenko considered. (*Id*. at 13.)

The court is not convinced that Yatsenko's analysis of the RM-Arian contract was so drastically deficient as to render Yatsenko's opinion unreliable. The Frank Parties challenge two of Yatsenko's assumptions as unfounded: first, that no payments were delivered under a contract which the parties executed but never performed, and second, that RM could have fulfilled its obligations under the contract without incurring expenses beyond its normal business costs. While neither assumption is irrefutable or self-evident, neither are they so unrealistic as to suggest bad faith. *See Boucher*, 73 F.3d at 21. Accordingly, the court declines to exclude Yatsenko's opinion based on his analysis of the RM-Arian contract.

### 4. Additional Arguments

The Frank Parties argue that two additional flaws in Yatsenko's analysis render his opinion unreliable. First, they contend that Yatsenko arbitrarily assumed a monthly growth rate of 10% in estimating RM's lost profits. (Mot. to Preclude at 13-14.) Yatsenko explained in his deposition testimony that he "based [his] projections of the profits on the assumptions of the client" and assumed that "the profits will grow from 240 million rubles

a month to 500 million rubles a month. After that, it will be flat."
(Yatsenko Tr. at 60:23-61:3.) In his supplemental declaration, he
clarified that rather than merely adopting the figures given by
the Settling Parties automatically, he used them because he "saw
no signs or evidence why the monthly revenue of RUB 500 mln
could not be achieved in 1-2 years," based on "RM's market po-
sition in 2011-2012 and RM's revenue . . . for 2012." (Yatsenko
Decl. ¶ 7.)

Second, the Frank Parties argue that Yatsenko unreasonably as-
sumed, without any market analysis, that RM had no assets in
the bank and no prior debt as of December 31, 2015. (Mot. to
Preclude at 14-15.) In his deposition testimony, Yatsenko ex-
plained that he had assumed for the purposes of his analysis that
RM had "either zero amount . . . or an insignificant amount in
the bank account." (Yatsenko Tr. at 58:7-14.) He also explained
that he had assumed RM had no prior debt, based on his deter-
mination that any actual debt was "negligible and could [be]
disregarded" in calculating lost profits. (*Id*. at 58:15-18; 59:4-
16.)

Here, too, while Yatsenko's analysis appears to rest on conven-
ient or self-serving assumptions, the assumptions are not wholly
unrealistic and the purported flaws are relatively minor. To the
extent these aspects of Yatsenko's methodology are flawed, such
flaws are more relevant to the question of weight than to admis-
sibility. The court therefore declines to preclude Yatsenko's
opinion on these grounds.

### D.  Ability to Help the Trier of Fact

Lastly, the Frank Parties ask the court to preclude Yatsenko's
opinion because it is "arithmetic[] rather than analysis" and will
therefore not assist the trier of fact. (Mot. to Preclude at 16-19.)
Rule 702 of the Federal Rules of Evidence provides that a district

court may admit expert testimony if, *inter alia*, "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). "If the testimony is instead directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help, the testimony is properly excludable." *United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991). "Testimony is properly characterized as 'expert' only if it concerns matters that the average juror is not capable of understanding on his or her own." *United States v. Mejia*, 545 F.3d 179, 194 (2d Cir. 2008).

Courts in this circuit have occasionally excluded expert testimony that consists only of "basic calculations" on the grounds that it is unhelpful. See *FPP, LLC v. Xaxis US, LLC*, No. 14-cv-6172 (LTS), 2017 WL 11456572, at *1 (S.D.N.Y. Feb. 13, 2017) (excluding expert opinion on damages that "uses three different figures provided to her by [counsel] and conducts simple arithmetic to calculate the resulting damages amount"); *Schwartz v. Fortune Magazine*, 193 F.R.D. 144, 147 (S.D.N.Y. 2000) (excluding expert opinion on damages that "merely consisted of calculating the commissions plaintiff would have earned had he continued to work for" defendant). On the other hand, courts have admitted expert testimony that takes the ultimate form of basic arithmetic when the expert used specialized knowledge, either to identify the appropriate inputs for the relevant computation or to determine what kind of calculation was necessary. See *Int'l Bus. Machines Corp. v. BGC Partners, Inc.*, No. 10-cv-128 (PAC), 2013 WL 1775437, at *7 (S.D.N.Y. Apr. 25, 2013) (finding that expert "did not mechanically perform rote calculations, but rather based his analysis on . . . qualitative determinations" that relied on specialized knowledge); *Hamza v. Saks Fifth Ave., Inc.*, 07-cv-5974 (FPS), 2011 WL 6187078, at *2 (S.D.N.Y. Dec. 5, 2011) (finding that expert "employed his specialized knowledge as a forensic

economist to organize and utilize each piece of this earnings 'puzzle' into a final calculation at which fact-finders would not be able to arrive themselves if each piece of information were presented to them individually").

The Frank Parties suggest that Yatsenko's so-called expert analysis was nothing more than the performance of basic calculations, using inputs and assumptions provided by the Settling Parties. But regardless of whether or not the inputs that are used in Yatsenko's opinion are the product of his independent judgment, his opinion plainly consists of economic analyses that require specialized knowledge and could not be replicated by a layperson. For example, in arriving at his conclusion regarding RM's lost profits, Yatsenko projected revenue, projected costs, and analyzed funding requirements. (*See* Yatsenko Report at ECF pp. 45-51.) Each aspect of this calculation entailed judgments that rested on specialized knowledge. Accordingly, the court finds that Yatsenko's opinion comports with the Federal Rules' requirement that expert testimony help the trier of fact to understand the evidence or determine a fact at issue.

## IV.    CONCLUSION

For the reasons explained above, the Frank Parties' (Dkt. 321) Motion to Preclude Yatsenko's testimony and (Dkt. 318) Motion to Strike Yatsenko's supplemental declaration are both DENIED.

SO ORDERED.

Dated:    Brooklyn, New York
             May 12, 2021

                                        /s/ Nicholas G. Garaufis
                                        NICHOLAS G. GARAUFIS
                                        United States District Judge